IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JODIE LYNN DAVIS, )
)
    Plaintiff, )
)
  v. ) Civil Action No. 16-112
)
CAROLYN W. COLVIN, )
ACTING COMMISSIONER )
OF SOCIAL SECURITY, )
)
    Defendant. )

O R D E R

AND NOW, this 30th day of March, 2017, upon consideration of Defendant's Motion for Summary Judgment (Doc. No. 10) filed in the above-captioned matter on June 2, 2016,

IT IS HEREBY ORDERED that said Motion is DENIED.

AND, further, upon consideration of Plaintiff's Motion for Summary Judgment (Doc. No. 8) filed in the above-captioned matter on April 19, 2016,

IT IS HEREBY ORDERED that said Motion is GRANTED IN PART and DENIED IN PART. Specifically, Plaintiff's Motion is granted to the extent that it seeks a remand to the Commissioner of Social Security ("Commissioner") for further evaluation as set forth below, and denied in all other respects. Accordingly, this matter is hereby remanded to the Commissioner for further evaluation under sentence four of 42 U.S.C. § 405(g) in light of this Order.

I. **Background**

On January 18, 2013, Plaintiff Jodie Lynn Davis protectively filed a claim for Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. (R. 156-59; 160-68). Specifically, Plaintiff claimed that she became disabled on May 13,

2010, due to depression, anxiety, a cognitive disorder, and asthma. (R. 160; 181). After being denied benefits initially, Plaintiff sought, and obtained, a hearing before an Administrative Law Judge ("ALJ"), which was held on August 4, 2014. (R. 32-79). In a decision dated September 19, 2014, the ALJ denied Plaintiff's request for benefits. (R. 11-27). On December 24, 2015, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. (R. 1-3). Plaintiff filed a timely appeal with this Court, and the parties have filed cross-motions for summary judgment.

## II.     Standard of Review

Judicial review of a social security case is based upon the pleadings and the transcript of the record. See 42 U.S.C. § 405(g). The scope of review is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact. See Matthews v. Apfel, 239 F.3d 589, 592 (3d Cir. 2001) (noting that "'[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive'" (quoting 42 U.S.C. § 405(g))); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999) (stating that the court has plenary review of all legal issues, and reviews the administrative law judge's findings of fact to determine whether they are supported by substantial evidence).

"Substantial evidence" is defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate'" to support a conclusion. Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999) (quoting Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995)). However, a "single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence." Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Kent v. Schweiker, 710 F.2d 110,

114 (3d Cir. 1983)). "Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g., that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion." Id.

A disability is established when the claimant can demonstrate some medically determinable basis for an impairment that prevents him or her from engaging in any substantial gainful activity for a statutory twelve-month period. See Fargnoli v. Massanari, 247 F.3d 34, 38-39 (3d Cir. 2001). "A claimant is considered unable to engage in any substantial gainful activity 'only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .'" Id. at 39 (quoting 42 U.S.C. § 423(d)(2)(A)).

The Social Security Administration ("SSA") has promulgated regulations incorporating a five-step sequential evaluation process for determining whether a claimant is under a disability as defined by the Act. See 20 C.F.R. § 416.920(a)(4). In Step One, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. See 20 C.F.R. § 416.920(a)(4)(i). If so, the disability claim will be denied. See Bowen v. Yuckert, 482 U.S. 137, 140 (1987). If not, the second step of the process is to determine whether the claimant is suffering from a severe impairment. See 20 C.F.R. § 416.920(a)(4)(ii). "An impairment or combination of impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.922(a). If the claimant fails to show that his or her impairments are "severe," he or she is ineligible for disability benefits. If the claimant does have a severe impairment, however, the Commissioner must proceed to Step Three and determine whether the claimant's impairment meets or equals the

criteria for a listed impairment. See 20 C.F.R. § 416.920(a)(4)(iii). If a claimant meets a listing, a finding of disability is automatically directed. If the claimant does not meet a listing, the analysis proceeds to Steps Four and Five.

Step Four requires the ALJ to consider whether the claimant retains the residual functional capacity ("RFC") to perform his or her past relevant work, see 20 C.F.R. § 416.920(a)(4)(iv), and the claimant bears the burden of demonstrating an inability to return to this past relevant work, see Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir. 1994). If the claimant is unable to resume his or her former occupation, the evaluation then moves to the fifth and final step.

At this stage, the burden of production shifts to the Commissioner, who must demonstrate that the claimant is capable of performing other available work in the national economy in order to deny a claim of disability. See 20 C.F.R. § 416.920(a)(4)(v). In making this determination, the ALJ should consider the claimant's RFC, age, education, and past work experience. See id. The ALJ must further analyze the cumulative effect of all the claimant's impairments in determining whether he or she is capable of performing work and is not disabled. See 20 C.F.R. § 416.923.

### III. **The ALJ's Decision**

In the present case, the ALJ applied the sequential evaluation process in reviewing Plaintiff's claim for benefits. At Step One, the ALJ found that Plaintiff had not been engaged in substantial gainful activity since January 18, 2013, her application date. (R. 13). The ALJ also found that Plaintiff met the second requirement of the process insofar as she had several severe impairments, specifically, borderline intellectual functioning, depression, anxiety, obesity, and asthma. (R. 13-14). After addressing whether Plaintiff's impairments met or medically equaled

the criteria of several listings, including Listing 12.05, the ALJ concluded that Plaintiff's impairments did not meet any of the listings that would satisfy Step Three. (R. 14-17).

The ALJ next found that Plaintiff retains the RFC to perform medium work as defined in 20 C.F.R. § 416.967(c) except that the work should have no exposure to concentration of extremes of cold, heat, wetness, humidity and pulmonary irritants such as gasses, fumes, dust and odors; the work is limited to unskilled entry work that does not require handling money as a part of the job; the work should have a Language level as found in the DOT of not more than 3 or equivalent to no more than a 4th grade reading level; Plaintiff requires a stable work environment where the work place and the work process remain generally the same from day-to-day and where the job site is fixed; in addition, the supervisor would direct the employee's work activity so that the employee does not have to prioritize or use judgment to determine order; the decision-making consists of several concrete variables in or from standardized situations; there should be no precision work; and there should be no face-to-face contact with the public or work as a part of a team. (R. 17).

At Step Four, the ALJ found that Plaintiff had no past relevant work, so she proceeded to Step Five. (R. 25). The ALJ then used a vocational expert ("VE") to determine whether or not a significant number of jobs existed in the national economy that Plaintiff can perform. The VE testified that, based on Plaintiff's age, education, past relevant work experience, and RFC, Plaintiff could perform jobs that exist in significant numbers in the national economy, such as packer and sorter. (R. 26; 72-73). Accordingly, the ALJ found that Plaintiff has not been under a disability as defined by the Act since her application date of January 18, 2013. (R. 27).

## IV.   Legal Analysis

Plaintiff's primary challenge[1] to the ALJ's decision in this case is to her Step 3 finding that Plaintiff's severe impairment of borderline intellectual functioning does not meet or equal the listing for intellectual disability at Section 12.05 of the regulations.[2] In particular, Plaintiff contends that the ALJ erroneously rejected a Full Scale IQ score of 67 assessed upon cognitive evaluation by Psychologist Lindsey A. Groves in August of 2011, which, if accepted, would meet the C criteria of Listing 12.05. She further argues that in rejecting that low IQ score the

---

[1]   The Court has considered Plaintiff's other challenges to the ALJ's evaluation of Plaintiff's severe impairment of obesity, alone and in combination with her severe impairment of asthma, at Steps 3 and 5 of the sequential evaluation process and finds them to be without merit.

SSR 02-1p recognizes that obesity is a medically determinable impairment and that "the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately." 2002 WL 34686281, at *1 (Sept. 12, 2002). Accordingly, the ruling instructs the ALJ "to consider the effects of obesity not only under the listings but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity." Id.; see also 20 C.F.R., Pt. 404, Subpt P, Appx. 1, §§ 1.00Q and 3.00O (formerly 3.00I).

The ALJ in this case expressly found obesity to be a severe impairment, addressed it at Step 3, acknowledged the applicability of SSR 02-1p, and indicated that she considered Plaintiff's weight in her decision. (R. 14; 22). Plaintiff does not specify in what way obesity would affect her residual functional capacity beyond the limitations the ALJ found and points to no evidence in the record supporting any additional functional limitations. Moreover, the ALJ relied on the medical evidence from Plaintiff's treating physicians as the basis for her RFC, and none of those sources suggested any further limitations in Plaintiff's ability to work based on her weight, although they obviously were aware of her obesity. See Rutherford v. Barnhart, 399 F.3d 546, 552-53 (3d Cir. 2005) (ALJ's reliance on medical evidence from sources who were aware of claimant's obesity but did not mention obesity as contributing to any limitations was "satisfactory, if indirect" consideration of evidence even where ALJ did not even mention obesity in decision). The Court is satisfied that the ALJ adequately addressed, both directly and indirectly, obesity and its effects, alone and in combination with Plaintiff's other impairments, at each step of the sequential evaluation process and that her evaluation is supported by substantial evidence.

[2]   Listing 12.05 was revised significantly effective January 17, 2017. See Revised Medical Criteria for Evaluating Mental Disorders, 81 F.R. 66138-01, 2016 WL 5341732 (Sept. 26, 2016). However, this Court will review the ALJ's decision using the rules in effect at the time the decision was issued. See id. at 66138 n.1. On remand, it is presumed the ALJ will use the revised listing for the entire period at issue but will leave that decision to the Commissioner.

ALJ improperly ignored not only Dr. Groves' report but also other diagnoses of mental retardation contained in the record.

While Plaintiff's argument that the ALJ did not set forth adequate reasons for rejecting the validity of the IQ score assessed by Dr. Groves has merit, the Court does not agree that the record is sufficient to establish that *ipso facto* she met Listing 12.05 as it existed at the time of the ALJ's decision, as the ALJ also determined that Plaintiff did not meet the introductory criteria of that listing, which required "deficits in adaptive functioning initially manifested … before age 22." However, because the ALJ did not adequately explain the methodology she utilized in determining that Plaintiff did not meet the introductory criteria of the pre-revision Listing 12.05, this Court cannot determine whether that finding is supported by substantial evidence, and this case will be remanded to the Commissioner for further analysis.

At the time of the ALJ's decision, Listing 12.05 provided in pertinent part:

> 12.05 Intellectual disability: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, <u>or</u> D are satisfied.
>
> * * *
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function ….

20 C.F.R., Pt. 404, Subpt. P, Appx. 1, § 12.05.

In this case, the record shows that at age 28, Plaintiff was administered a Wechsler Adult Intelligence Scale – Fourth Edition IQ test by Dr. Groves in August of 2011, which reflected a Verbal Comprehension score of 78, a Perceptual Reasoning score of 73 and a Full Scale IQ score

of 67. (R. 252). If valid, Plaintiff's Full Scale IQ score of 67 would have satisfied the criteria of Listing 12.05C in effect at the time of the ALJ's decision.[3]

While acknowledging that Plaintiff's Full Scale IQ score of 67 was "extremely low" and that it placed her in the range of mild mental retardation, the ALJ nevertheless rejected that score because the "weight of the evidence indicates … that plaintiff functions in the borderline intellectual functioning range." (R. 14). In rejecting the validity of the score, the ALJ relied on numerous factors, including that the Full Scale IQ score of 67 is inconsistent with the results of prior intelligence testing revealing a Full Scale IQ score of 84 in May of 1988 and a Binet testing IQ score of 75 assessed in 1989; that Plaintiff was able to graduate from high school with special education assistance; that her treating psychiatrist, Dr. Shirley John, described Plaintiff as being of "average" intelligence; and, that the "totality of the evidence" indicates that Plaintiff is independent in her personal care and her daily activities and that she engages in regular social activities. (R. 14-15).

In arriving at a determination of whether an IQ score is valid, the ALJ is to consider the entire record before her. See Schmidt v. Comm'r of Soc. Sec., 2013 WL 1386881, at *1 n. 1 (W.D. Pa. April 4, 2013); Manigault v. Astrue, 2009 WL 1181253, at *9 (W.D. Pa. Apr. 30, 2009) (citations omitted). While it is true that an ALJ is not required to accept a claimant's IQ scores and may reject scores that are inconsistent with the record, see Markle, 324 F.3d at 186,

---

[3] The version of Listing 12.05C effective at the time of the ALJ's decision required a claimant to have a *valid* verbal, performance or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. The applicable regulations only required that one of the three IQ scores be in the 60 through 70 range. 20 C.F.R., Pt. 404, Subpt. P, Appx. 1, §12.00D.6.c; Markle v. Barnhart, 324 F.3d 182, 186 (3d Cir. 2003). The second prong of 12.05C was satisfied by a finding that the "other" impairment is "severe" within the meaning of Step 2 of the sequential evaluation process. Markle, 324 F.3d at 188; 65 F.R. 50746, 2000 WL 1173632, at 50772 (Aug. 21, 2000). Here, the ALJ found that Plaintiff has the "other" severe impairments of depression, anxiety, obesity, and asthma.

8

neither may "[a]n ALJ ... reject IQ scores based on personal observations of the claimant and speculative inferences drawn from the record." Morales, 225 F.3d at 318.

Here, as in Markle, the Court does not believe that the ALJ's rejection of Plaintiff's Full Scale IQ score of 67 is supported by substantial evidence. Of particular significance, the Court does not believe that the ALJ gave appropriate consideration to the narrative report from Dr. Groves discussing the results of her cognitive evaluation. The regulations expressly recognize that "the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and degree of functional limitation." 20 C.F.R., Pt. 404, Subpt. P, Appendix 1 §12.00D.6. Accordingly, the commentary accompanying an IQ score should be consulted in evaluating the credibility of the test result. Cortes v. Comm'r of Soc. Sec., 255 Fed. Appx. 646, 652 n 4 (3d Cir. 2007).

Here, in her narrative report Dr. Groves explicitly found the IQ results to be "valid" and "reflective of [Plaintiff's] current level of functioning." (R. 252). She reported that Plaintiff's Full Scale IQ score of 67 places her in the 1st percentile of adults of her age and indicates "a present overall ability that was in the Extremely Low range of intellectual functioning." (Id.). In addition, Plaintiff's subtest scores indicate that her ability to efficiently process information is "severely impaired" and that her visual short-term memory, psychomotor and processing speed, and motor coordination are "significantly delayed." (R. 253). Overall, Dr. Groves concluded that Plaintiff's cognitive impairments and IQ scores place her in the range of mild mental retardation. (Id.).

Although the ALJ briefly alluded to the fact that Dr. Groves considered Plaintiff's scores to be valid, she brushed that opinion aside as being against the weight of the evidence for the reasons set forth above. However, as just discussed, the Full Scale IQ score of 67 is consistent

with the other subtest results of Dr. Groves' evaluation and the record contains no other contemporaneous opinion from any psychologist or other medical expert contradicting the IQ results or indicating a higher current level of intellectual functioning.  See Markle, 324 F.3d at 187.  To the contrary, although Plaintiff's treating psychiatrist Dr. John indicated that Plaintiff's "intelligence appears to be average" her axis II diagnosis nevertheless included mental retardation.  (R. 330-31).  Likewise, the state agency psychologist, Dr. Rings, did not appear to question the validity of the scores assessed by Dr. Groves and in fact acknowledged that Plaintiff's IQ score falls in the mild mental retardation range.  (R. 85).

With no medical opinion evidence to support it, the ALJ's conclusion that Plaintiff "functions in the borderline intellectual functioning range" appears to be based on nothing more than speculative inferences drawn from the record.  However, this is not a situation where the psychologist conducting the test questioned the validity of the results or diagnosed Plaintiff with borderline intellectual functioning.  See Manigault, 2009 WL 1181253, at * 9 (psychologist who diagnosed claimant with borderline intellectual functioning rather than mild mental retardation, despite IQ scores in the 61-70 range, implicitly found scores to be invalid.).  Nor is there any evidence suggesting that Plaintiff was malingering or deliberately attempting to distort the test results.  See Miller v. Astrue, 2011 WL 2580516, at *6 n.10 (W.D. Pa, June 28, 2011).  And, as in Markle, the various daily activities and social activities in which Plaintiff engages likewise are not necessarily inconsistent with mild mental retardation.

In rejecting the validity of the Full Scale IQ score of 67 assessed by Dr. Groves when Plaintiff was 28, the ALJ also pointed to the inconsistency of that result with the childhood IQ scores assessed when Plaintiff was 5 and 6 years old, as well as her graduation from high school through special education classes.  However, rather than being a basis to reject the validity of

Plaintiff's current IQ scores, the childhood IQ scores and her scholastic record more aptly should have been considered in determining whether Plaintiff's current deficits in adaptive functioning manifested prior to age 22, which brings the Court to the issue necessitating remand in this case.

In order for a claimant's impairment to meet a listing, it must satisfy <u>all</u> of the specified criteria of the listing at issue. See Sullivan v. Zebley, 493 U.S. 521, 530 (1990); 20 C.F.R. 416.925(d). Accordingly, at the time of the ALJ's decision, *in addition to* the criteria of at least one of the A through D provisions, the claimant *also* was required to meet the introductory criteria of Listing 12.05. [4] The requirement that the claimant meet the introductory criteria to Listing 12.05 clearly and unequivocally was stated in the explanatory notes to the pre-revision mental disorder listings. See 20 C.F.R., Pt. 404, Subpt. P, Appx. 1, § 12.00A (if claimant's impairment satisfies diagnostic description in introductory paragraph and any one of the four sets of criteria in A through D, the impairment meets Listing 12.05). The United States Court of

---

[4] The revised Listing 12.05 effective January 17, 2017, significantly alters the criteria of the listing. The revision divides the listing into A and B criteria, and indicates that it may be satisfied by meeting either. The A criteria requires all three of the following: "significantly subaverage general intellectual functioning evident in your cognitive inability to function at a level required to participate in standardized testing of intellectual functioning"; <u>and</u>, "significant deficits in adaptive functioning currently manifested by your dependence upon others for personal needs (for example, toileting, eating, dressing, or bathing)"; <u>and</u> "[t]he evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22." The B criteria requires all three of the following: "significantly subaverage general intellectual functioning evidenced by" *either* "[a] full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence"; *or* "[a] full scale (or comparable) IQ score of 71–75 accompanied by a verbal or performance IQ score (or comparable part score) of 70 or below on an individually administered standardized test of general intelligence"; <u>and</u>, "significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental function: understand, remember, or apply information (see 12.00E1)"; *or* "interact with others (see 12.00E2)"; *or* "concentrate, persist, or maintain pace (see 12.00E3)"; or "adapt or manage oneself (see 12.00E4)"; <u>and</u>, "the evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22."

Appeals for the Third Circuit likewise had indicated that a claimant was required to satisfy the criteria of the introductory paragraph of former Listing 12.05.  See Gist v. Barnhart, 67 Fed. Appx. 78, 81 (3d Cir. 2003) (holding that "[a]s is true in regard to any 12.05 listing, before demonstrating the specific requirements of Listing 12.05C, a claimant must show proof of a 'deficit in adaptive functioning' with an initial onset prior to age 22"); Cortes, 255 Fed. Appx. at 651 (to meet Listing 12.05, the claimant must prove, *inter alia*, "'subaverage general intellectual functioning with deficits in adaptive functioning' manifesting before age 22").  See also Illig v. Comm'r of Soc. Sec., 570 Fed. Appx. 262, 266 n. 9 (3d Cir. 2014) ("We will assume without deciding that showing deficits in adaptive functioning is a fourth requirement of Listing 12.05C.").

In her decision, in addition to rejecting the validity of Plaintiff's current IQ score, the ALJ also found that Plaintiff did not meet the introductory criteria of prior Listing 12.05 requiring "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period."  (R. 15).  In making this determination, the ALJ relied extensively on the assessment by the state agency psychologist, who found that Plaintiff does not meet the capsule definition because "she is able to cook, to care for her person independently, she can go out on her own and she can shop."  (R. 85).  The ALJ, with little additional analysis, gave this opinion substantial weight and concluded that Plaintiff did not meet the preface to Listing 12.05.  (R. 15).  Because the Court cannot meaningfully determine the ALJ's basis for finding that Plaintiff did not meet the requirement of having deficits in adaptive functioning manifested before age 22, this Court must conclude that the ALJ's finding is not supported by substantial evidence, and will remand this case to the ALJ for

additional evaluation. See Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004) (requiring the ALJ to sufficiently explain his findings to permit meaningful review).

The regulations in effect at the time the ALJ issued her decision did not define "deficits of adaptive functioning," nor did they identify guidelines by which to assess the existence or severity of a claimant's alleged deficits.[5] See Logan v. Astrue, 2008 WL 4279820, at *8 (W.D. Pa., Sept. 16, 2008). However, the SSA previously issued a regulation entitled "Technical Revisions to Medical Criteria for Determinations of Disability", 67 F.R. 20018-01, 2002 WL 661740 (April 24, 2002), to provide guidance on the matter. In that regulation, the SSA recognized that each of the four leading professional mental health organizations in the United States that deal with intellectual disabilities defines "deficits in adaptive functioning" in a slightly different manner.[6] See Logan, 2008 WL 4279820, at *8. These various definitions all

---

[5]  The revised regulations set forth rules on the documentation and evaluation of intellectual disorders under Listing 12.05. See 20 C.F.R., Pt 404, Subpt P, Appx 1, § 12.00H. Included are rules for establishing deficits in adaptive functioning at § 12.00H3. Adaptive functioning now is defined as referring to "how you learn and use conceptual, social, and practical skills in dealing with common life demands. It is your typical functioning at home and in the community, alone or among others." § 12.00H3a. Significant deficits in adaptive functioning are identified "based on your dependence on others to care for your personal needs, such as eating and bathing. We will base our conclusions about your adaptive functioning on evidence from a variety of sources (see 12.00H3b) and not on your statements alone." Id.

[6]  For example, the American Psychiatric Association most recently stated that deficits in adaptive functioning "refer to how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background." Diagnostic and Statistical Manual of Mental Disorders (DSM-V) 37 (5th ed., American Psychiatric Ass'n 2013). Such deficits "limit functioning in one or more activities of daily life, such as communication, social participation, and independent living, across multiple environments, such as home, school, work, and community." Id. at 33. Further, adaptive functioning involves reasoning in three domains: "The *conceptual (academic) domain* involves competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations, among others. The *social domain* involves awareness of others' thoughts, feelings, and experiences; empathy; interpersonal communication skills; friendship abilities; and social judgment, among others. The *practical domain* involves learning and self-management across life settings, including personal

require significant deficits in intellectual functioning, but differ as to the age of onset and the method of measuring the required deficits in adaptive functioning. Id. The SSA clarified that it did not seek to endorse the methodology of one professional organization over another, and would allow use of <u>any</u> of the measurement methods endorsed by one of the professional organizations. Id. In order to assess a claimant's alleged intellectual disability to determine if deficits in adaptive functioning exist, the regulation directed that an ALJ should consult either the American Psychiatric Association's DSM-V, the standard set forth by the American Association on Intellectual and Developmental Disabilities or the criteria of the other major mental health organizations. Id.

In this case, it does not appear from the ALJ's decision that she consulted any organization's standard for measuring deficits in adaptive functioning in concluding that Plaintiff does not meet that criterion. In fact, the ALJ simply adopted the conclusory opinion of the state agency psychologist without any further analysis. Because the ALJ's assessment of whether Plaintiff has "deficits in adaptive functioning" fails to comply with the SSA's regulatory

---

care, job responsibilities, money management, recreation, self-management of behavior, and school and work task organization, among others." Id. at 37. This criterion is met when at least one of these three domains of adaptive functioning is sufficiently impaired that ongoing support is needed in order for the person to perform adequately in one or more life settings at school, at work, at home, or in the community. Id. at 38.

The standard for intellectual disability set forth by the American Association of Mental Retardation (now the American Association on Intellectual and Developmental Disabilities) includes "significant limitations in intellectual functioning and in adaptive behavior as expressed in conceptual (*i.e.,* receptive and expressive language, reading and writing, money concepts, and self-direction); social (*i.e.,* interpersonal, responsibility, self-esteem, gullibility, naiveté, follows rules, obeys laws, and avoids victimization); and practical adaptive skills (*i.e.,* personal activities of daily living such as eating, dressing, mobility and toileting; instrumental activities of daily living such as preparing meals, taking medication, using the telephone, managing money, using transportation, and doing housekeeping activities; maintaining a safe environment, and occupational skills)." Logan, 2008 WL 4279820, at *8 n.4 (citing <u>Manual of Diagnosis and Professional Practice in Mental Retardation</u> (American Ass'n on Mental Retardation, 1993)).

directive, effective at the time, to identify the standard she used to determine that Plaintiff does not meet the introductory criterion to Listing 12.05, she failed to sufficiently explain her findings to permit meaningful review. Accordingly, the ALJ's Step 3 finding is incomplete and remand is required for reconsideration of whether Plaintiff has established deficits in adaptive functioning and whether such deficits manifested prior to age 22. While the Court takes no position as to whether, on remand, Plaintiff should be found to have met Listing 12.05, it does find a more focused analysis as to the application of Listing 12.05C is required in this case.[7]

V. **Conclusion**

Because the record does not permit the Court to determine whether substantial evidence exists to support the ALJ's determination at Step Three that Plaintiff does not meet Listing 12.05, the Court finds that substantial evidence does not support the ALJ's decision in this case. The Court hereby remands this case to the ALJ for reconsideration consistent with this Order.

    s/ Alan N. Bloch  
Alan N. Bloch  
United States District Judge

ecf: Counsel of record

---

[7] Because the Court is remanding the case on this ground, it does not reach the other issue raised by Plaintiff regarding the ALJ's evaluation of her cognitive impairment at Step 5 of the sequential evaluation process. On remand, the ALJ should consider Plaintiff's concerns in determining whether any additional restrictions to Plaintiff's RFC resulting from her cognitive impairments, including, in particular, any additional restrictions arising from Plaintiff's difficulties in concentration, are appropriate.